**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF TEXAS**

**LAREDO DIVISION**

| | | |
|---|---|---|
| **GREGORY JOHNSTON** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 5:18-cv-00126** |
| | § | |
| **EQUINOR TEXAS ONSHORE** | § | |
| **PROPERTIES, LLC,** | § | |
| **EQUINOR PIPELINES, LLC,** | § | |
| **EQUINOR USA ONSHORE** | § | |
| **PROPERTIES, INC., AND** | § | |
| **EQUINOR US OPERATIONS, LLC,** | § | |
| *Defendants.* | § | |
| | § | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Gregory Johnston, by and through his undersigned counsel, (hereinafter also "Plaintiff"), allege facts and claims upon his personal knowledge as to matters relating to himself, and upon information and belief as to all other matters based upon the investigation of counsel, as follows:

**I. INTRODUCTION**

1.    This action is brought to remedy the systemic breach of contract by Equinor Texas Onshore Properties LLC (f/k/a StatOil Texas Onshore Properties, LLC), Equinor Pipelines LLC (f/k/a StatOil Pipelines, LLC), and Equinor US Operations LLC (f/k/a StatOil Gulf Services, LLC) (hereinafter collectively "Equinor" and/or Defendants) in connection with Equinor's use of an improper methodology to calculate and pay Plaintiff contractually-owed oil and gas royalties.  In 2010, Talisman Energy USA, Inc., now known as Repsol Oil & Gas USA, LLC ("Talisman") and Equinor Defendants entered a joint development agreement to own and produce oil and gas from multiple wells and leases across the Eagle Ford, Texas area.  Under the joint development agreement, Equinor and Talisman divided the oil and gas production on

a roughly 50-50 basis. Equinor and Talisman sold their own shares of production and each paid royalty owners for their share of the production sold.

2.    Starting in 2009, the Eagle Ford saw a remarkable rise in new rigs and new production.[1] Effective August of 2013, Equinor assumed the position of authorized operator for wells in the eastern area of operations which covered principally Karnes, DeWitt and Bee counties. Effective April of 2016, Equinor assumed the position of authorized operator for all joint wells in all Eagle Ford areas.

3.    This is not a "shrinkage case." It is not an argument over Defendants' choice of production accounting methods (i.e., volumetric allocation). Defendants lacked adequate "condensate" production data and/or other data, and in an attempt to cover up that lack of data, Defendants skimmed volumes of production due Plaintiff. This skimming of production due Plaintiff was, for one period, thirty percent (30%). This is an across the board skim. Much of the Eagle Ford shale production is light and unstable "condensate," which must be stabilized before the product is marketable. "Condensate" refers to a lighter grade of crude oil, often produced in conjunction with wells that produce large amounts of natural gas. Stabilization requires treatment, usually in the form of heating and pressurization, to remove the volatile and lighter elements— principally methane and other natural-gas liquids. These lighter elements, known as "flash gas," can be collected and reintroduced back into the natural gas stream for subsequent processing and sale. Equinor and its joint venturer, Talisman, constructed over a dozen different batteries or central facilities sometimes referred to as Central Delivery Points ("CDP's") or Central Receipt Points ("CRP's") to perform this necessary processing. Additionally, Defendants entered into a line-fill agreement where the operators agreed to put a

---

[1] *See* https://www.eia.gov/petroleum/drilling/pdf/eagleford.pdf

minimum volume in the pipeline and, if they miss that volume, pay a fee. Defendants passed those fees on to others.

4.    Initial processing occurs at the separator near the well where the raw stream is split into water, oil, condensate, and gas. The oil/condensate and gas are measured at a meter installed at the tail-end of the separator. The kind of meter matters. Here, one of the meters Defendants used was a turbine flow meter, which is not appropriate for, as here, multi-phase production (i.e., water, oil, gas and condensate in the stream). Additional processing occurs between this point of measurement and measurement at the point of sale. Between that processing and natural evaporation of condensate/oil, there is typically a reduced volume measured at the sales meter. According to the American Petroleum Institute ("API"), "shrinkage factor" is "any stream delivering production to a gathering system under pressure will require a volume correction factor to correct to stock tank or atmospheric conditions." This is <u>not</u> a shrinkage or shrinkage factor case. It is a skimming case. Skimming, according to the Association of Certified Fraud Examiners ("ACFE") "is the removal of cash from the victim entity prior to its entry into the accounting system…because the stolen funds are never recorded, the victim organization might not be aware that the cash was ever received." Defendants are skimming an asset, and not appropriately accounting for that asset. Here's a diagram to show the difference between "shrinkage," which this case is not, and "skimming," which this case is:



5.    At each point in the above-referenced diagram, Defendants metered the production data and were aware of the actual data.  Instead of preserving this production data, Defendants over-wrote and destroyed it, then amended their reports to the Texas Railroad Commission ("TRRC") to show less production data.  Consider, by way of production data from shaleprofile.com, the following comparison of production data by Defendants as of August 2016 and, later, May of 2017 for the same time frame (2011-2012) for the same product (gas):



Reported as of August 2016          Reported as of May 2017

When Defendants claim that there must be a "well-by-well" analysis (predictably arguing complications in class certification), such is not true for several reasons.  First, this is a skimming case—not a shrinkage case. Second, and more problematic for Defendants, is that they deleted all the data to prevent any accurate recreation (even though it isn't pertinent here anyway).  Indeed, in other litigation, Defendant Talisman admitted in its appellate brief it no longer had the data to even attempt the recreation:

> Matrix's witnesses testified without contradiction that the metering system used by Talisman allowed some unknown portion of the gas and liquid hydrocarbons produced by several wells to pass into lines controlled by Talisman without being metered.  The uncontradicted testimony is that Talisman sold the unmetered gas and liquid hydrocarbons, and informed Matrix that it deemed the amount of the windfall it had received from the sale uncalculatable, and it therefore would not pay the Non-Operators their share of the proceeds from the sale of the unmetered gas and liquid hydrocarbons." *Exhibit 1*, No 4-15-00791-CV, pg. 64, Appellant's Brief of Talisman Energy USA Inc. June 2, 2016.

Defendants' lack of a proper methodology (due to Talisman's destruction of production data) resulted in both improperly calculating payments due to royalty owners including, *inter alia*, Plaintiff Johnston. Additionally, upon information and belief, Defendants' methodology did not obtain the appropriate price for the product, and permitted Defendants to take expense deductions that were not proper.

## II. PARTIES

6.    Plaintiff Gregory Johnston is a citizen of Texas and resident of McMullen County, Texas. Mr. Johnston owns lease interests entitling him to royalty payments on the actual oil and gas produced from wells operated by Equinor and/or Talisman. Plaintiff Johnston entered into oil and gas lease agreements with Equinor and/or Talisman for the development, production, and sale of oil and gas in Texas. *See Johnston Lease Attached as Exhibit 2.* Since that time, Plaintiff Johnston has been underpaid royalties as a result of the improper skimming by Defendants, their failure to obtain the appropriate price for the product, and improper expense deductions.

7.    Equinor Texas Onshore Properties LLC ("Equinor Texas"), upon information and belief, is and has been at all times material and relevant herein, a for-profit corporation organized and existing under the laws of the State of Delaware with its principle place of business in Houston, Texas. Defendant Equinor Texas Onshore Properties LLC may be served with process through its registered agent, Capital Corporate Services, Inc., 206 E. 9th Street, Suite 1300, Austin, Texas 78701. This Defendant has already answered and is before this Honorable Court.

8.    Equinor Pipelines LLC ("Equinor Pipelines"), upon information and belief, is and has been at all times material and relevant herein, a for-profit corporation organized and existing under the laws of the State of Delaware with its principle place of business in Wilmington, Delaware and/or Stamford, Connecticut, conducting business in Texas. Defendant Equinor

Pipelines LLC may be served with process through its registered agent, Corporation Service Company d/b/a CSC – Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.  This Defendant has already answered and is before this Honorable Court.

9.    Equinor US Operations LLC ("Equinor Operations"), upon information and belief, is and has been at all times material and relevant herein, a Delaware limited liability corporation with its principle place of business in Stamford, CT conducting business in Texas.  Defendant Equinor US Operations LLC may be served with process through its registered agent, Corporation Service Company, as reflected in the Texas Secretary of State records, at 211 E. 7th Street, Suite 620 Austin, Texas 78701-3218.  This Defendant has already answered and is before this Honorable Court.

## III. JURISDICTION

10.    This Court has jurisdiction over Plaintiff's claims pursuant to Title 28 U.S.C.  §1332(d). Diversity jurisdiction exists and Plaintiff resides in Texas. Plaintiff Johnston has oil and gas rights for property including leases involving the Talisman and/or Equinor defendants. The amount in controversy exceeds  $75,000.00 but not over $5,000,000.00 for  Plaintiff, exclusive of interests and costs, by virtue of the amount of royalties Equinor failed to pay pursuant to its contractual obligations, and by virtue of the declaratory relief sought. This court has personal jurisdiction,  both specific and general, over Defendants because they are doing business in Texas.  Moreover, Defendants committed acts and/or omissions within the State of Texas, including directed their activities within the State of Texas such that they can reasonably anticipate being haled into Texas courts.  Additionally, one or more Defendants are essentially at home in the State of Texas.  Texas courts' assertion of jurisdiction over these Defendants

does not offend the notions of fair play and substantial justice, and Defendants could reasonably anticipate being haled into Texas court. Defendants have systematic and continuous contacts within the State of Texas and, moreover, the specific acts and/or omissions at issue in this lawsuit occurred within the State of Texas.

## IV. VENUE

11.    Venue is proper in the Southern District of Texas, Laredo Division, where Plaintiff's wells at issue are located, where material acts occurred, and where Plaintiff owns royalty rights to wells and resides. Venue is proper in this district pursuant to Title 28 U.S.C. 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this federal district.

## V. FACTS

12.    Plaintiff owns royalty rights and interests arising from oil and gas leases in the South Texas Eagle Ford shale play ("Eagle Ford"). Equinor was established as a wholly-state-owned oil company in 1972. Reform in 1985 made it possible to consider the ownership structure of Equinor and apply for public listing. This reform marked the start of a process leading up to the public listing of Equinor in 2001. Norsk Hydro ASA ("Hydro") was founded in 1905 as a private company. Hydro-electric development at the beginning of the 20th century laid the basis for industrial growth in Norway and for Hydro's business concept, which was the production of nitrogen fertilizer. Hydro entered the oil and gas industry in 1963, and in October of 2007, merged with Equinor. Today, Equinor is a Norwegian-based energy company with operations in more than thirty (30) countries.

13.    Talisman is an upstream oil and gas production company and an indirect subsidiary of Calgary, Alberta-based Talisman Energy Inc. ("TEI") which was acquired for approximately $13

billion by an affiliate of the Spanish integrated energy company Repsol S.A. on May 8, 2015. In 2010, Talisman and Equinor entered a joint development agreement to own and produce oil and gas from multiple wells and leases across the Eagle Ford, Texas area. Under the joint-development agreement, Equinor and Talisman divided the oil and gas production on a roughly 50-50 basis. Equinor actually identifies the Eagle Ford play on its website. Equinor and Talisman sold their own shares of production and each paid royalty owners for their share of the production sold. By entering into a joint venture, Equinor became jointly and severally liable for payments made to royalty owners.

14.    In Texas, gas and oil leases permit royalty payments to be calculated based on the amount of gas or oil as determined either at the wellhead or the amount that enters the pipeline for sale, and may be based on production of oil and gas, or sales of the produced oil and gas.

15.    The production of oil, condensate and natural gas at a well site is measured daily at the wellhead by a meter. However, at the relevant wells here, Talisman used the wrong meter—a turbine meter. Manufacturers of the turbine meter warn not to use this type of meter on a multi-phased well—precisely the wells at issue here. However, turbine meters are cheaper than more accurate meters. According to flowmeters.com: "Turbine flowmeters are less accurate at low flow rates…and turbine flowmeters should not be operated at high velocity…two-phased flow conditions can also cause turbine flowmeters to measure inaccurately." Additionally, according to Cameron, a manufacturer and division of Schlumberger, "precautions must be exercised to prevent gas flashing, which can cause catastrophic failures and/or high readings." Here, for these wells, several had gas flashing.

16.    Pursuant to Texas oil and gas law, the operating entity is responsible for reporting all required well production data to Texas Comptroller of Public Accounts (hereinafter "Texas

Comptroller"). Title 16, TEX. NAT. RES. CODE. Reports to the Texas Comptroller include both volumes sold and revenues received, by product reported.

17.     Texas law also requires that any entity paying oil and gas royalties must accompany the payment with a check stub from the payor containing details, *inter alia*, of well identification, volume of production, price, decimal interest (the royalty owner's share of production from the drilling unit), expense deductions, and taxes. TEX. NAT. RES. CODE §§91.501-91.502. The required check stub detail is intended to allow the royalty recipient to verify that the payment accords with the payor's obligation under applicable leases. When Defendants filed their *Applications for Exception to Statewide Rules (SWR) 26 and/or 27* (Form P17), they represented to the TRRC that "production is measured separately from all leases or individual wells before commingling" which results in "Notice [to royalty owners] not required." As a consequence, statements to royalty owners did not contain commingling notices, exceptions to meters notices, or any other exception to which royalty owners could have objected to the TRRC. Put simply, Plaintiff never even had the opportunity to present these claims to the TRRC, let alone understand what Defendants were doing—Defendants fraudulently concealed their misconduct and equitable tolling applies.

18.     In 2010, Talisman entered the Texas oil and gas market and opened a Texas office whereby it acquired extraction rights under numerous oil and gas leases in the Eagle Ford shale including those owned by Plaintiff. Talisman also entered into the South Texas Joint Development Agreement (the "Development Agreement"), which created a joint venture between Talisman and Equinor to explore, develop and produce oil and gas. Equinor also owns extraction rights under numerous oil and gas leases in the Eagle Ford. Both Defendants entered into long-term production, sales, transportation, and marketing agreements.

19.     The Development Agreement obligated the well operator, including Equinor, to report all well-production data to the non-operating partner in a manner consistent with and as required by the Texas Comptroller, so that both the operator and non-operating partner could comply with Texas law governing royalty payments, expenses, adjustments and deductions thereto and documentation including check stubs to mineral rights owners.

20.     Under the Development Agreement, Equinor and Talisman agreed to divide the oil and gas production on a 50-50 basis.   Equinor and Talisman sell their own share of the production, are required to properly report their half of the volumes to royalty owners, and must properly pay royalty owners.

21.     Plaintiff Johnston is an owner of the royalty rights for oil and gas leases in Eagle Ford that establish his rights to properly calculated royalty payments. The Development Agreement did not change Plaintiff's rights to proper royalty payments.

22.     Initially, Talisman acted as operator for all of the Eagle Ford joint venture acreage, with Equinor retaining a non-operating, working interest. While the operator of record, Equinor and/or Talisman were responsible for accurately reporting the oil and gas production to the Texas Railroad Commission and state Comptroller.

23.     While the operator and/or joint venture partner with Equinor, Talisman began in late 2012 to commingle the gross production of oil, condensate and gas from various wells of differing ownership, including Plaintiff's wells, using extensive gathering and treatment facilities referred to as Central Gathering Points, Central Deliver Points and/or Central Receipt Points.

24.     Equinor's joint venturer, Talisman, has admitted that when it entered the Texas oil and gas market, it did not have the capability to manage the complexities of the leases it was

purchasing or the agreements it was entering into; its production accounting system was incapable of proper allocation of commingled oil and gas production and sales.

25.    Effective July 1, 2013, Equinor and Talisman modified their Joint Development Agreement so as to divide responsibility for drilling and operating wells in the joint venture acreage, including those in which Plaintiff owned royalty interests.

26.    According to the Joint Development Agreement modification effective July 1, 2013, Talisman continued operating wells within the western and central portion of the shared holdings, and Equinor agreed to operate the wells in the eastern portion of the shared acreage.  However, Talisman continues to market its own share of production and maintain a revenue accounting function to account for the revenues received from sales of production and allocate revenues back to each owner on a per-well basis.

27.    In December of 2015, Equinor and Talisman further amended the Joint Development Agreement to provide that Equinor now serves as operator for all wells within the joint venture acreage, with Talisman retaining a non-operating working interest.

28.    Unbeknownst to Plaintiff, Equinor and Talisman's joint decision to commingle gross oil and gas production from wells of differing ownership interest created certain challenges when allocating the commingled sales of those production volumes back to the individual wells. Texas law requires that a "commingler" identify each royalty owner's aliquot share of production commingled and sold with reasonable certainty.  Equinor and its joint venturer, Talisman, did not properly allocate these commingled sales of those production volumes.  Yet, Defendants represented to the TRRC they had done so.

29.    In addition to their commingling and allocation problems, Equinor and Talisman jointly reduced the measured volumes of gas and oil by an across-the-board skim (the "Skim").  Equinor

and Talisman used gross production volumes of condensate reduced by as much as 30% to estimate net sales of condensate then improperly allocated those volumes back to the individual wells before improperly paying royalty owners, like Plaintiff, on the improperly skimmed volumes.  Again, this is not a "shrinkage" case and, more pertinent, "shrinkage" according to industry standard, is not even an appropriate term for Defendants' skimming activities.

30.     The issues with joint venturer Equinor's and Talisman's commingling, allocating and skimming were not clear to or discoverable by Plaintiff. While the Joint Development Agreement required Equinor and Talisman to share production and pay royalties  on a 50-50 basis, the information and format of Talisman's check stubs were different from the information and format of Equinor's check stubs  and  for  production  and  production  adjustments during different  time  periods  than  those reflected on check stubs, it was difficult, if not impossible, for Plaintiff to determine the net difference, let alone the reason for the net difference,  in royalty payments.  Defendants concealed their conduct from Plaintiff, and thus tolled the statute of limitations under the discovery rule, fraudulent concealment, and equitable tolling doctrines.

31.     Equinor's joint venturer, Talisman, has admitted to reducing Plaintiff's royalty payments based on what they (inaccurately) refer to as "shrinkage."  Talisman has also admitted that if it could not justify its lower  production  volume,  both  Equinor and  Talisman,  via  joint  venture, would  be  legally responsible to make additional royalty payments to royalty owners pursuant to their respective lease agreements.

32.     In response to royalty owner's questions regarding the difference in the royalty payments between Talisman and Equinor, Talisman explained away the Skim by contending that in transporting and marketing oil, certain volumes of condensate (light oil) do not qualify for royalty

payments because they are lost to "shrinkage."  Again, "shrinkage" is not the appropriate term for what Defendants did.  They skimmed.

33.    In the oil and gas industry, shrinkage refers to the difference between production amounts produced at the wellhead entering a pipeline for sale.  Shrinkage attributable to a given well is not a static percentage.  There is a domestic oil industry standard or common practice which allows for application of a fixed shrinkage factor—for what exists between the reservoir and the storage tank or wellhead.  There is not, however, any such standard to estimate sales.  Moreover, based upon information and belief, Equinor's joint venturer, Talisman's own personnel, concluded shrinkage, if applicable, could never approach the 20% Skim, and certainly never 30%.  That was skimmed—not shrunk.

34.    Any reduction of royalty payments under a mineral rights lease must be permitted and justified, either from actual measurement or established American domestic oil industry standards. Plaintiff's lease provisions require  joint venturers, Equinor and Talisman, to pay on actual sales not estimated, commingled, allocated, shrunken or calculated net sales volumes as done here.

35.    Regardless whether the production volume is measured  at the well head, after separation, or at the point of sale, under no circumstances do the applicable leases permit the afore-mentioned Skim.

36.    In employing the Skim for the purpose of shorting royalty payments to Plaintiff, Equinor and its joint venturer Talisman engaged in actions that were arbitrary, capricious, and in bad faith.

37.    Equinor and its joint venturer Talisman have also arbitrarily manipulated production volumes and royalty payments from joint-venture wells operated by Talisman and reported skimmed and improperly allocated net sales volumes to the Texas Railroad Commission and State Comptroller.   Upon information and belief, Equinor used a pricing methodology that systematically underpaid Plaintiff, and systematically took expense deductions that were not proper, for which Plaintiff further brings this cause.

38.    Complaints were made about the discrepancies between royalty checks from Equinor and Talisman, but only misleading explanations were provided.

## VI. EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

39.    Equinor and its joint venturer Talisman arbitrarily and unilaterally manipulated royalty owner payments by estimating sales volumes through the skimming of gross production volumes and improperly allocating commingled production and net sales volumes.

40.    Equinor and its joint venturer Talisman intentionally concealed the actions herein described in the forgoing paragraphs to ensure the continuation of those activities and forestall legal action.

41.    Without access to the Joint Development Agreement, well production, run sheets and gauge reports, and Equinor's and Talisman's sale and distribution agreements, Plaintiff would be unable to determine the extent and nature of Equinor's and its joint venturer Talisman's wrongful conduct or the financial harm suffered because of such conduct. None of these documents critical to exposing Equinor's and its joint venturer Talisman's wrongful conduct were given to Plaintiff. Thus, Plaintiff was left with inadequate information. Moreover, Equinor and Talisman did not simply disclose its commingling, allocating and estimating to Plaintiff.

Moreover, Equinor and Talisman concealed or obfuscated such information such that Plaintiff could not reasonably ascertain the issues discussed herein.

42.    By its very nature, Equinor's and its joint venturer Talisman's activity, as alleged herein, was self-concealing. Plaintiff had no knowledge of Equinor's and its joint venturer Talisman's deceitful conduct and could not have discovered same by the exercise of due diligence.

43.    As a result of Equinor's and its joint venturer Talisman's fraudulent concealment of its conduct, and the self- concealing nature of their acts, Plaintiff asserts the tolling of the applicable statute of limitations affecting the rights of the causes of action asserted by Plaintiff.

44.    Equinor is equitably estopped from asserting that any otherwise applicable limitations period has run.

## VII. THE DISCOVERY RULE

45.    Plaintiff did not discover, nor should Plaintiff have reasonably discovered, Equinor's and its joint venturer Talisman's wrongful conduct causing his injuries until recently, prior to the filing of this complaint.

46.    Plaintiff did not discover, nor should Plaintiff reasonably have discovered, (1) the injuries and (2) the identity of the person(s) whose wrongful conduct caused the injuries, until recently, prior to the filing of this complaint.

47.    The discovery rule applies to toll the statute of limitations as to all causes of action against Equinor and its joint venturer Talisman, and other responsible parties identified by discovery in this matter.

# VIII. CLAIMS

## COUNT 1
## BREACH OF CONTRACT

48.    Plaintiff incorporates by reference all preceding paragraphs.

49.    Plaintiff executed valid and enforceable contracts in the form of oil and gas leases, directly or through assignments, with Equinor.

50.    Plaintiff, as a party to the lease and assignments and/or royalty owner, is the proper parties to enforce the terms of the relevant leases and assignments and have performed, or have substantially performed, all necessary conditions precedent, dependent obligations, and/or dependent covenants owed under the relevant leases and assignments.

51.    Pursuant to the materially similar lease terms, Equinor promised to make royalty payments based on the actual production volume of gas and oil sold.

52.    Plaintiff has been entitled to Equinor's performance of its obligations under the relevant leases and assignments to make royalty payments based on the actual production volume of gas and oil sold.

53.    Equinor materially breached the gas and oil leases applicable to Plaintiff by paying royalty owners based on estimated production volumes sold as a result of Equinor improperly allocating net sales from commingled production and applying the Skim to gross production volumes and thereby reducing the royalty payments owed to Plaintiff.

54.    Equinor has refused and continues to refuse to perform its obligations to pay Plaintiff royalty payments based on the actual production volumes of gas and oil sold as required by the applicable lease agreements.

55.    As of the filing of this Complaint Equinor has not tendered the amounts owed to Plaintiff.

56.     Defendants have materially breached their contractual obligations to Plaintiff, including the express terms set out above in the Facts. Examples of such breaches include but are not limited to the following:

      a.      Through the Skim Scheme, reducing production volumes of oil, or liquid or liquefiable hydrocarbons and/or natural gas produced from the relevant lands by approximately 20% - 30% without notice or contract support under the existing oil and gas lease contracts;

      b.      Failing to pay the agreed royalty payments for oil or liquid or liquefiable hydrocarbons produced and sold from the relevant lands as provided for in their oil and gas lease;

      c.      Failing to pay royalties on all oil, condensate and gas produced and sold from the relevant lands as provided for in their oil and gas lease;

      d.      Using a systematic methodology of pricing and expense deduction that improperly reduced royalty amounts due Plaintiff; and

      e.      Refusing to provide Plaintiff, among other materials, relevant and related records and data pertaining to the production, transportation, sale, and marketing of the production from the relevant lands.

57.     As a direct and proximate cause of Equinor's contractual breaches, Plaintiff has been damaged for which he is entitled to recover actual damages, general damages, special damages, nominal damages, consequential damages, interest, penalties, attorneys' fees, and any other legal or equitable relief deemed appropriate by the Court.

**COUNT 2**
**ACCOUNTING**

58.     Plaintiff incorporates by reference all preceding paragraphs.

59.     Damages alone will not compensate Plaintiff for his collective loss of royalty payments consistent with his oil and gas lease contracts. The facts and accounts presented are so complex that adequate relief may not be obtained at law. Standard discovery procedures, such

as requests for production, interrogatories, and subpoenas *duces tecum,* may prove inadequate to provide Plaintiff with the information sought regarding royalty payments. Relevant input data necessary to perform an individualized calculation has been destroyed by Defendants. Financial documents, as well as sale value allocation and other reliable data, can provide adequate foundational data to compute unpaid royalties.

60.    Plaintiff seeks an accounting pursuant to the information required under Texas Natural Resources Code Section 91, *et seq.* as follows:

a.    For past and present monthly production volumes of oil, liquids, condensate, liquefied hydrocarbons and natural gas by well for Plaintiff as reported to the Texas Comptroller or other state or federal agency, to royalty owners by Equinor, as recorded by any third-party vendor contracted by Equinor to test, sample or record such volumes;

b.    For past and present royalty payments made to Plaintiff on the production of oil, liquids, condensate, liquefied hydrocarbons and natural gas production volumes, and substances;

c.    For past and present deductions by category of expense or other deductions including but not limited to deductions for "shrinkage" (as Defendants coin the term, but is really a skim), and for past and present information supporting any deduction or expense from or to production volumes or royalty payments; and

d.    For past and pricing methodology used to calculate Plaintiff's royalty payments.

**COUNT 3**
**FRAUD AND NEGLIGENT MISREPRESENTATION**

61.    Plaintiff incorporates by reference all preceding paragraphs.

62.    Defendants made material, false representations to Plaintiff including, *inter alia*, representations regarding Plaintiff's royalties, pricing, expense deductions, and other misrepresentations found, *inter alia*, on their check stubs, correspondence, and/or other sources generated or provided by Defendants.

63.      When Defendants made these and other representations, Defendants (a) knew the representations were false, or (b) made the representations recklessly, as a positive assertion, and without knowledge of its truth.

64.      Defendants made these representations with the intent Plaintiff act on them.

65.      Plaintiff relied on these representations, and the representations caused Plaintiff injury and/or damage.

66.      Plaintiff brings fraud causes of action against Defendants including, *inter alia*, common-law fraud, fraud by nondisclosure, and statutory fraud pursuant to Texas law.

67.      Defendants' representations outlined herein further constitute negligent misrepresentation.

68.      Defendants' acts or omissions outlined herein were a proximate or producing cause of Plaintiff's injuries or damages.

### COUNT 4
### UNJUST ENRICHMENT AND QUANTUM MERUIT

69.      Plaintiff incorporates by reference all preceding paragraphs.

70.      Equinor has been unjustly enriched because of the Skim Scheme, commingling, improperly allocating, shrinking and underpayment of royalties owed to Plaintiff as described herein.

71.      Plaintiff, in justice and fairness, is entitled to restitution of all underpayments of royalties caused by such wrongful acts and omissions which unjustly enriched Equinor, recovery of reasonable attorneys' fees, recovery of statutory penalties and interest as provided at TEX.NAT.RES. CODE §§91.401 ~ 91.404, for unjust enrichment, *quantum meruit,* and punitive damages and any and all other equitable relief deemed appropriate by the court.

### COUNT 5
### DECLARATORY JUDGMENT

72.     Plaintiff incorporates by reference all preceding paragraphs.

73.     Plaintiff is entitled to a declaratory judgment: (a) declaring Equinor liable to Plaintiff for the wrongful acts, omissions, practices, and schemes described above, (b) ordering Equinor to provide complete and accurate check stub information, as required by TEX.NAT.RES. CODE §91.502, (c)  determining the correct calculation of Plaintiff's royalties under the applicable lease(s), (d) determining the correct pricing methodology generally applicable to Plaintiff, (e) determining the correct expense deduction to make to Plaintiff's royalty calculation, and (f) granting Plaintiff such other or additional declaratory and/or injunctive relief relating to such wrongful acts, omissions, practices, and financial/accounting schemes as may be available under the law and deemed appropriate  by the Court, and/or (d) awarding attorneys' fees as provided for by contract or pursuant to TEX.NAT.RES. CODE §91.406, and TEX.CIV.PRAC. &  REM. CODE 38.001 *et seq.*

## IX. REQUEST FOR  RELIEF AND PRAYER

74.     WHEREFORE, Plaintiff requests an award and relief as follows:

    a.    A determination that Equinor breached obligations owed Plaintiff;

    c.    A declaration and Order providing the other declaratory and injunctive relief requested throughout this Complaint;

    d.    An Order requiring Equinor to provide an accounting of past and present royalty payments for Plaintiff;

    e.    Actual, general, special, nominal and consequential damages in an amount to be determined at trial;

    f.    Applicable statutory penalties for Claims for which they are available;

    g.    Punitive damages for Claims for which they are available;

    h.    Equitable and/or declaratory relief for Claims for which they are available,

including, *inter alia*, such relief outlined above in paragraph seventy-three (73);

i.    An order awarding Plaintiff his costs of suit, including reasonable attorneys' fees and pre-and post-judgment interest at the highest rate allowed by law;

j.    Such other and further relief as may be deemed necessary or appropriate.

## XI. DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully Submitted,

**THE FERGUSON LAW FIRM, LLP**

350 Pine Street, Suite1440
Beaumont, Texas 77701
Tel: 409.832.9700
Fax: 409.832.9708

By: **/s/ Jane S. Leger**
      Jane S. Leger State Bar
State Bar No. 00788814
jleger@thefergusonlawfirm.com


By: **/s/ Paul "Chip" Ferguson**
      Paul "Chip" Ferguson State
State Bar No. 06919200
cferguson@thefergusonlawfirm.com

By: **/s/ Mark C. Sparks**
      Mark C. Sparks
State Bar No. 24000273
mark@thefergusonlawfirm.com

  AND

By: **/s/ Layne Walker**
Layne W. Walker
The Walker Law Firm
State Bar No. 20713900
905 Orleans Street
Beaumont, Texas 77701
(409) 347-6650 – T

22

(409) 347-6651 – F
Walkerlaw3@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document was served on the following counsel of record in accordance with the Federal Rules of Civil Procedure on this 4th day of November 2019.

Fields Alexander
State Bar No. 00783528
falexander@beckredden.com
Christopher R. Cowan
State Bar No. 24084975
ccowan@beckredden.com
Marcos Rosales
State Bar No. 24074979
mrosales@beckredden.com
Mary Kate Raffetto
State Bar No. 24098296
mkraffetto@beckredden.com
1221 McKinney Street, Suite 4500
Houston, TX 77010
(713) 951-3700 – T
(713) 951-3720 – F
***ATTORNEYS FOR DEFENDANTS EQUINOR TEXAS ONSHORE PROPERTIES LLC, EQUINOR PIPELINES LLC, AND EQUINOR US OPERATIONS, LLC.***

By: **<u>Mark C. Sparks</u>**
Mark C. Sparks